After a 35-year marriage, the parties were divorced in 1992. The divorce judgment required Jimmy K. Baggett ("the husband") to pay Patricia R. Baggett ("the wife") periodic alimony in the amount of *Page 737 
$3,000 per month. The judgment also provided:
 "As security for the husband's alimony obligation, he is directed to maintain the two American General Life Insurance Policies in the amounts of $50,000 and $100,000; and [to] name the wife as beneficiary thereon, until his obligation to pay alimony to the wife ceases."
In 1998, the husband filed a petition to modify the judgment, seeking a termination of his obligation to pay alimony and his obligation to maintain the two life-insurance policies with the wife as beneficiary. The husband alleged that he had recently suffered a severe stroke, that he was unable to work, and that he had no reasonable expectation of being able to work in the future. After a hearing, the trial court declined to terminate the husband's alimony obligation because, it found, the husband had "over $400,000 of income from a mortgage" during the preceding year. The trial court did, however, reduce the husband's monthly alimony obligation from $3,000 to $2,750, to take into account the amount of a monthly Social Security disability benefit the wife received as a consequence of the husband's being disabled. The husband appealed the judgment to this court; the judgment was affirmed by this court, without an opinion. See Baggett v. Baggett (No. 2980301, April 30, 1999),777 So.2d 332 (Ala.Civ.App. 1999) (table).
In 2002, the husband filed another petition to modify the divorce judgment, again alleging that he was disabled and unable to work, but also alleging that his savings and income-producing assets had been depleted. The wife filed a counter-petition, alleging that the husband was in contempt of the court's prior orders to pay her alimony. The court conducted a hearing on June 24, 2002.
The husband testified that he made all of his periodic alimony payments until February 2002, when, he said, he ran out of money. When he was questioned about the $400,000 that he had earned from a mortgage on real estate, he said that the money was gone. He testified that his current income consisted of Social Security disability benefits in the amount of $850 per month and an annuity that paid him approximately $6,000 per year. He submitted his federal income-tax return for 2001 showing a gross income of $11,291.
Keith Baggett, one of the parties' two adult sons, testified that the husband had deteriorated mentally as well as physically after the stroke. He said that the husband suffered from "impaired reasoning" and "severe depression." He testified that, after the stroke, the husband had become very gullible and had been "scammed" on several occasions by "flim-flam artists." Keith testified to the details of several "scams" in which the husband had invested and lost large sums of money. One investment "scam" involved an $80,000 purchase of automatic-teller machines.
Keith stated that, as a consequence of the husband's poor judgment in financial matters, he had convinced the husband to convey the residence the husband was awarded in the divorce judgment to him in exchange for his promise to take care of the husband for life. Keith testified that the residence was worth $85,000. Keith also testified that, after the husband conveyed the residence to him, Keith conveyed the residence to a corporation wholly owned by him.
When questioned about why he conveyed the residence to his corporation, Keith responded that he was having marital problems at the time and he did not want the same thing that happened to his father to happen to him in the event that *Page 738 
he and his wife divorced. Keith said that he had mortgaged the residence for $50,000 in order to have the funds to operate his business. Keith acknowledged that, before the husband conveyed the residence, the husband had paid off the existing mortgage on the residence. Keith conceded that the husband had spent "about $10,000" on Keith's tuition when Keith had decided to pursue his studies in a different field. Keith also testified that the husband had transferred an $87,000 annuity to him, but, he said, he has been giving the husband the income from the annuity. He has also been allowing the husband to live in the residence.
The wife testified that she too was awarded a residence in the divorce judgment. That residence had been recently appraised at $275,000. The wife stated that the residence was not mortgaged at the time of the divorce, but since then she had mortgaged it. The parties' other adult son, Lex, lives with the wife and pays no rent. The wife testified that she has a variety of medical problems that render her unable to work.
Following a hearing, the trial court determined that, in the real-estate and annuity transactions between the husband and Keith, the husband had defrauded the wife, and Keith had defrauded the husband. The court specifically found:
 "While it is not questionable that the former husband made several bad investments with people who took advantage of him, the evidence further disclosed that the son got the former husband to convey the former husband's home to the son for no consideration and the son then placed the home in a corporation for which the son was the sole stockholder. He testified that he did this because he, the son, was having family problems at the time."
The court "nullified as fraudulent" the husband's transfer of his residence and his annuity to Keith. The trial court entered a judgment that reduced the husband's monthly alimony obligation to $1,500; ordered the husband to "turn over to the wife" the insurance policies on his life and to continue to pay the premiums on those policies; ordered the husband to pay the wife $11,928.25, representing past-due periodic-alimony and insurance-premium payments, at the rate of $300 per month; and awarded the wife an attorney fee of $3,500.
The husband filed a postjudgment motion, alleging that the trial court had no authority to nullity the transfer and, in effect, to order Keith or his wholly owned corporation to reconvey property to the husband because, the husband argued, neither Keith nor the corporation had been a party to the modification and contempt action. After a hearing, the trial court agreed and entered an amended judgment that states, in pertinent part:
 "The Court does find that the adult son, Keith Baggett, and the corporation which the son owns 100% of the stock in at this time, were not parties to the action and therefore, this Court's Order ordering them to reconvey items which the Former Husband had conveyed to them is hereby deleted.
 "The Court leaves it up to counsel for the Former Husband as to whether or not he desires to bring an action in behalf of the Former Husband against the adult son and the corporation.
". . . .
 "The conveyances elected by the Former Husband which, in essence, conveyed the family home to the son, who then takes out a loan of $50,000 on the home which went to the son's benefit and then, the Former Husband having transferred his annuity worth $87,000 to *Page 739 
the son clearly was an effort to defraud the Former Wife of any support and to rule otherwise would amount to the Court saying, `well done.'
 "The Court elects not to do so and especially in light of the fact that the alimony award was reduced by this court's latest Order, it moves the Former Husband to file whatever actions he deems as necessary to obtain the return of his property and to continue to support the Former Wife pursuant to this Court's last Order."
 I.
The husband argues that the trial court erred in finding that he fraudulently transferred assets to his son Keith.
 "Two types of fraudulent transfers, actual and constructive, are within the scope of the Alabama Fraudulent Transfer Act, Ala. Code 1975, § 8-9A-1
et seq. See McPherson Oil Co. v. Massey, 643 So.2d 595
(Ala. 1994). An actual fraudulent transfer is one made by a debtor who transfers assets `with actual intent to hinder, delay, or defraud any creditor of the debtor.' Ala. Code 1975, § 8-9A-4(a). The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer. Ala. Code 1975, § 8-9A-4(b); McPherson Oil, supra. A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of the transfer. Ala. Code 1975, § 8-9A-5(a); McPherson Oil, supra."
Varner v. Varner, 662 So.2d 273, 276 (Ala.Civ.App. 1994).
The husband argues that he was not guilty of actual fraud because, he says, as a consequence of his stroke, he was incapable of forming the intent to defraud. The husband did not make this incapacity argument to the trial court. The husband argues that he was not guilty of constructive fraud because, he claims, the transfers to his son Keith were supported by consideration, i.e., Keith's promise to take care of the husband for the rest of his life. We need not address the husband's argument concerning constructive fraud and consideration because we hold that the evidence was sufficient to support the trial court's conclusion that the husband and Keith were engaged in actual fraud.
Although the husband's testimony was hazy on many details concerning his financial transactions with others, his testimony demonstrates that he was fully cognizant of his financial obligations to his former wife. When asked whether he knew that he was to "be responsible for [$2,750] a month alimony," he responded "I know that. I'd see that it come out of the bank account every month." The record also demonstrates that the husband was concerned about, and was not totally unfamiliar with the ways of, protecting his investments. He testified that, when he had his investment account at "NBC Securities in Birmingham," he had lost money because of fluctuations in the stock market. He testified that he could not keep a close watch on the stock market, so he decided to change his accounts to "Morgan Keegan at Regions Bank in Montgomery" because, he stated, "they could keep that account fed. They did it automatically." The record contains evidence from which the trial court could infer that the husband, who was not unaware of financial matters, believed that he had been supporting the wife long enough and that it was time for him to plan, with his son Keith, to "look out for number one." On cross-examination *Page 740 
of the husband by the wife's counsel, the following occurred:
 "Q. Mr. Baggett, you would have had the money to continue paying your wife had you not spent $80,000 or $90,000 or whatever you spent on all those [automatic-teller] machines for somebody else, wouldn't you?
 "A. I had to make a living for myself. So I invested that money to make a living for myself to get Keith — to get him out of school so he could make a living for me, too. I have done all that looking out for number one. Nobody else is going to look out for me. I have been paying [the wife] $2700 — $3000 a month for a long time for eight or nine years.
"Q. And now it was time somebody paid for you?
 "A. I think [the wife] could move out — I think she could sell that house. She doesn't need a big house. She doesn't need it at all. But I can't tell her what to do with it. I don't expect her to tell me what to do with my money either.
 "Q. Knowing that you owed [the wife] a sum certain every month, . . . you transferred that annuity that brought you almost $6000 a year the last couple of years to a corporation, didn't you?
 "A. I did that so Keith would have money to make me a living."
We have reviewed the evidence, and we conclude that the trial court was authorized to find that, although the husband may have been "gullible" in some financial matters and may have been the victim of "scams" by others, he was capable of understanding that, if he transferred certain assets to his son Keith, he would be able to reduce or eliminate his periodic-alimony obligation to his former wife.
 "'In Alabama a transfer of . . . property made to defeat a spouse's marital right is voidable. Pattillo v. Pattillo, 414 So.2d 915 (Ala. 1982). Whether a specific transfer is done to defeat the spouse's rights is a question for the trier of facts, i.e. the trial court in this case. Pattillo.'"
Capps v. Capps, 699 So.2d 183, 185 (Ala.Civ.App. 1997) (quoting Prestwoodv. Prestwood, 523 So.2d 1071, 1073-74 (Ala.Civ.App. 1988)).
We hold that the evidence was sufficient to support the trial court's finding that the husband defrauded the wife by transferring assets to Keith. Consequently, we find no error in the trial court's declining to terminate the husband's alimony obligation.
 II.
The husband contends that the trial court erred by ordering him to transfer to the wife the life-insurance policies insuring his life. He argues that the order constituted an invalid modification of a property-division provision in the parties' divorce judgment. We agree.
By the terms of the divorce judgment, the insurance policies were assets belonging to the husband. The judgment, however, required the husband to maintain the policies for the benefit of the wife and to make the premium payments thereon as "security for [his] alimony obligation."Compare Hayter v. Hayter, 15 Or. App. 90, 92-93, 514 P.2d 1350, 1351-52
(1973) (holding that when a husband was awarded "`all policies of insurance on his life,'" and ordered to pay the premiums on three of the policies and, as to those three policies, to "`transfer all incidents of ownership to the wife,'" the wife "was given basically a security interest designed to assure the husband's performance of his obligations under the support and maintenance provisions" of the divorce judgment). *Page 741 
In the present case, the requirement that the husband maintain the policies and pay the premiums thereon was modifiable because the trial court specifically termed the requirement a "security for the husband's alimony obligation," thereby making the husband's obligation terminable upon the wife's remarriage or death. See Strong v. Strong, 709 So.2d 1259,1261 (Ala.Civ.App. 1998), in which this court explained:
 "A provision in a divorce agreement obligating the spouse to maintain a life insurance policy for the benefit of his dependent former spouse, once incorporated into a divorce judgment, is not modifiable if the provision is treated as a part of a property division or as alimony in gross. Kahn [v. Kahn, 682 So.2d 1377] at 1380 [(Ala.Civ.App. 1996)]. However, if the provision is contingent in nature, that is, if the obligation terminates upon the dependent former spouse's remarriage or death, then the provision is modifiable."
The ownership of the policy itself, however, was not modifiable because the divorce judgment recognized the policy as an asset belonging to the husband (subject to the limitations outlined in the judgment). The property-division provisions of a divorce judgment become final 30 days after the judgment is entered and are not subject to modification thereafter. McGiboney v. McGiboney, 679 So.2d 1066, 1068 (Ala.Civ.App. 1995). Because the trial court had no jurisdiction to order the husband to transfer ownership of the life-insurance policies to the wife, we must reverse that portion of the trial court's judgment.
 III.
The husband maintains that the trial court erred by awarding the wife an attorney fee. Section 30-2-54, Ala. Code 1975, gives the trial court discretion to award an attorney fee in an action alleging contempt for failure to pay alimony:
 "In all actions for divorce or for the recovery of alimony, maintenance or support in which a judgment of divorce has been issued or is pending and a contempt of court citation has been made by the court against either party, the court may, of its discretion, upon application therefor, award a reasonable sum as fees or compensation of the attorney or attorneys representing both parties."
After considering "the results of the litigation, the nature of the conduct of the parties, the financial circumstances of the parties, and the earning capacities of the parties," Campbell v. Tolbert, 656 So.2d 828,830 (Ala.Civ.App. 1994), we conclude that the trial court did not abuse its discretion in awarding the wife an attorney fee of $3,500.
The judgment of the trial court is affirmed insofar as it found the husband in contempt and modified his alimony obligation; the judgment is reversed insofar as it ordered the husband to transfer his life-insurance policies to the wife.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., dissents. *Page 742